December 28, 1979

## 79-90   MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION

### Constitutional Law—Fourth Amendment Exclusionary Rule—Legislative Proposal

This responds to your request that we consider whether Congress may constitutionally limit the scope of the Fourth Amendment exclusionary rule in Federal criminal proceedings. Specifically, you have asked us to consider whether Congress may constitutionally enact legislation limiting the application of the exclusionary rule along the lines of the bill drafted by Senator Kennedy's staff, and establishing alternative remedies similar to those provided in the current draft of the Administration's amendments to the Federal Torts Claim Act (FTCA). This legislation would permit evidence seized in violation of the Fourth Amendment to be admitted in Federal criminal proceedings, if otherwise admissible, if the agent conducting the search or seizure reasonably believed that his conduct was lawful; permit victims of illegal searches and seizures to sue the United States and receive liquidated damages and special damages upon proof of a constitutional violation; deny the United States a good faith defense in such suits; and establish disciplinary procedures whereby either the appropriate Federal agency or the victim of an illegal search or seizure could bring charges against the offending Federal agent.

It is our conclusion, based on relevant Supreme Court decisions, that, absent other equally effective remedies to deter Federal officers from violating the Fourth Amendment, the exclusionary rule is required by the Constitution to protect that Amendment's guarantee against unlawful searches and seizures. Congress may enact alternative remedies, but the ultimate responsibility for evaluating the efficacy of those alternative remedies lies with the courts. We believe that the proposed statute would be held constitutional, even though it purports to limit the scope of the exclusionary rule, because it provides an alternative that the courts are likely to find adequate.

489

## I. History of the Exclusionary Rule

The exclusionary rule has been shaped more by experience than by logic. Imposed by the Supreme Court in *Weeks* v. *United States,* 232 U.S. 383 (1914), the exclusionary rule was initially justified on considerations of fair play and on the judgment that notions of judicial integrity should prevent Federal court involvement in illegal searches and seizures:

> The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions * * * should find no sanction in the judgment of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights. [*Id.* at 392.]

Equally important, the exclusionary rule was necessary to protect Fourth Amendment rights:

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.[1] [*Id.* at 393.]

The Court several years later read *Weeks* quite broadly, holding that a person could not be compelled to produce books and documents before a grand jury where the materials had been illegally seized by the Government and then returned. *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 (1920). Justice Holmes, writing for the Court, rejected the arguments that the Government may properly subpoena materials of which it knows only because of an illegal search: "The essence of a provision forbidding the acquisition of evidence in a certain way is that

---

[1] *Weeks* relied in large part on *Boyd* v. *United States,* 116 U.S. 616 (1886), where the Court had held that a district court order requiring production of invoices in a forfeiture proceeding under the customs laws violated the defendant's Fourth and Fifth Amendment rights. The Court noted the interrelation of the protections of the two Amendments: seizure of private papers is tantamount to compelling a person to testify against himself; and the Fifth Amendment prohibition "throws light on" the reasonableness of the search. *Id.* at 633. In language that has been much quoted, the Court stated:

> The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offenses * * * . Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard, the Fourth and Fifth Amendments ran almost into each other. [*Id.* 630.]

not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."[2] Acceptance of the contrary position, Justice Holmes wrote, would reduce the Fourth Amendment to "a form of words." *Id.* at 392.

The exclusionary rule fashioned in *Weeks* applied only to evidence illegally obtained by Federal officers for use in Federal trials. In 1949, the Court held that the basis of the Fourth Amendment—"[t]he security of one's privacy against arbitrary intrusion by the police"—is implicit in "the concept of ordered liberty" and thus enforceable against the States through the Fourteenth Amendment's due process clause. *Wolf* v. *Colorado,* 338 U.S. 25, 27–28 (1949). However, the Court refused to find that due process demanded application of the exclusionary rule to start criminal proceedings. Although the Court acknowledged that the exclusionary rule might be an effective way to deter unreasonable searches, it was not prepared to hold that "a State's reliance upon other methods * * * if consistently enforced," could not equally ensure that State police conduct would comport with due process dictates. *Id.* at 31.

In *Mapp* v. *Ohio,* 367 U.S. 643 (1961), the Court reversed *Wolf* and declared the exclusionary rule applicable to all State criminal proceedings. The Court stressed that the rule, as developed in *Weeks* and *Silverthorne,* is "a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to 'a form of words.'" *Id.* at 648. Although "not basically relevant" to the Court's constitutional holding, it surveyed the years since *Wolf* and found other State remedies for protection of the Fourth Amendment inadequate. *Id.* at 651–53. The Court cited with approval language in *Elkins* v. *United States,* 364 U.S. 206, 217 (1960), that the exclusionary rule is necessary "to compel respect for the constitutional guaranty in the only effective available way."[3]

## II. Deterrence and Judicial Integrity

From the exclusionary rule's inception two principles that have informed the development of the doctrine have been recognized: (1) exclusion of illegally obtained evidence is necessary to protect the guarantees of the Fourth Amendment, and (2) courts should not sanction illegal activities of Government agents by permitting the fruits of such activities to be received into evidence. It is now "commonplace" to refer to those

---

[2] This statement has been characterized by the present Court as a "broad dictum" that has been "substantially undermined by later cases." *United States* v. *Calandra,* 414 U.S. 338, 352 n. 8 (1974).

[3] Illegally seized evidence was barred in other situations: *Elkins* v. *United States,* 364 U.S. 206 (1960) (prohibiting Federal use of evidence illegally obtained by State officials); *Rea* v. *United States,* 350 U.S. 214 (1956) (Federal officer may be enjoined from providing to State authorities evidence seized pursuant to an invalid search warrant); *Lee* v. *Florida,* 393 U.S. 378 (1968) (Federal Communications Act provisions prohibit use of wiretap conversations in State proceeding).

sources and goals of the exclusionary rule as considerations of "deterrence" and "judicial integrity."[4] *Brown* v. *Illinois,* 422 U.S. 590, 599 (1975). *See, e.g., Stone* v. *Powell,* 428 U.S. 465, 484–86 (1976); *Terry* v. *Ohio,* 392 U.S. 1, 12–13 (1968); *Elkins* v. *United States,* 364 U.S. at 217–23.

The relative importance ascribed by the Court to deterrence and judicial integrity in the development of the exclusionary rule has varied. Where the Court has expanded the scope of the doctrine, it has emphasized the judicial integrity rationale. *See, e.g., Lee* v. *Florida,* 392 U.S. 378, 385–86 (1968) (evidence seized in violation of Federal Communications Act not admissible in State trials); *Mapp* v. *Ohio,* 367 U.S. at 659–60; *Elkins* v. *United States,* 364 U.S. at 222 (overruling "silver platter" doctrine). Where the Court has sought to limit the reach of the exclusionary rule, it has relied largely on the deterrence principle and has found that application of the exclusionary rule to the facts of the case would not significantly aid in deterring illegal police conduct. *See, e.g., Michigan* v. *DeFillippo,* 99 S. Ct. 2627, 2633 n. 3 (1979); *Stone* v. *Powell,* 428 at 482–95; *United States* v. *Janis,* 428 U.S. 433, 457–60 (1976).

Over the past decade or so, it has become clear that the deterrence rationale now bears the laboring oar in exclusionary rule analysis. Recent Supreme Court cases teach that the doctrine of judicial integrity is not to be

---

[4]The phrase "the imperative of judicial integrity" was coined by Justice Stewart in *Elkins* v. *United States,* 364 U.S. at 222, which held that evidence seized illegally by State officials could not be admitted in Federal trials. The "judicial integrity" rationale is usually traced to the dissenting opinions of Justices Holmes and Brandeis in *Olmstead* v. *United States,* 277 U.S. 438, 469, 471 (1928):

> I think it is a less evil that some criminal should escape than that Government should play an ignoble part. [*Id.* at 470 (Holmes, J., dissenting).]
>
> * * * * * * *
>
> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against the pernicious doctrine this Court should resolutely set its face. [*Id.* at 485 (Brandeis, J. dissenting).]

The dissenters adopted an unfragmented view of the Government as punisher of criminals: "no distinction can be taken between the Government as prosecutor and the Government as judge." *Id.* at 470 (Holmes, J., dissenting). The Court in later cases has tended to disaggregate "the Government." *See generally* Shrock & Welsh, "Up from Calandra: The Exclusionary Rule as a Constitutional Requirement," 59 Minn. L. Rev. 251, 254–60 (1974).

While there is a tendency to "constitutionalize" the words of Justices Holmes and Brandeis, their opinions make clear that the obligation of Federal courts to exclude illegally seized evidence arises "apart from the Constitution." 277 U.S. at 469 (Holmes, J., dissenting); *id.* at 479–85 (Brandeis, J., dissenting). It should be noted, however, that the question whether the Federal courts have any power to exclude evidence beyond that arising from the Constitution and Federal statutes, *i.e.,* whether they have a reservoir of "supervisory power," is presently before the Supreme Court. *See, United States* v. *Payner,* No. 78-1729, Oct. Term 1979.

treated as determinative; indeed, the cases appear to strip it of any weight.[5] The basis for a critique of the doctrine is that it proves too much: if judicial integrity is offended by any use of illegally seized evidence, then the doctrine would effectively establish a right not to be convicted upon illegally seized evidence. However, the standing cases, *e.g., Rakas* v. *Illinois,* 439 U.S. 128 (1978), and impeachment cases, *e.g., Walder* v. *United States,* 347 U.S. 62 (1954), make it clear that "the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings against all persons." *United States* v. *Calandra,* 414 U.S. 338, 348 (1974). *See, Stone* v. *Powell,* 428 U.S. at 485; *United States* v. *Janis,* 428 U.S. at 458 n. 35.[6]

The saliency of deterrence became clear in *Linkletter* v. *Walker,* 381 U.S. 618 (1965), where the Court refused to give retroactive effect to *Mapp. See* Miles, "Decline of the Fourth Amendment: Time to Overrule *Mapp* v. *Ohio?"* 27 Cath. L. Rev. 9, 69 (1977). Faced with perhaps thousands of prisoners convicted between *Wolf* and *Mapp,* the Court found refuge in stressing deterrence:

> *Mapp* had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights. This, it was found, was the only effective deterrent to lawless police action * * * . We cannot say that this purpose would be advanced by making the rule retrospective. This misconduct of the police prior to *Mapp* has already occurred and will not be corrected by releasing the prisoners involved * * * . Finally, the ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late. [*Id.* at 636–37.][7]

---

[5]The commentators have generally recognized the decline and fall of "the imperative of judicial integrity." *See, e.g.,* Sanders & Robbins, "Judicial Integrity, The Appearance of Justice, and the Great Writ of Habeas Corpus: How to Kill Two Thirds (or More) with One Stone," 15 Am. Crim. L. Rev. 63, 76–78 (1977); Schrock & Welsh, *supra,* note 4, at 263–69. They have also noted the inherent difficulties in the concept. *See, e.g.,* McGowan, "Rule-Making and the Police," 70 Mich. L. Rev. 659, 692 (1972); Monaghan, "The Supreme Court, 1974 Term—Forward; Constitutional Common Law," 89 Harv. L. Rev. 1, 5–6 (1975); Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 U. Chi. L. Rev. 665, 668–69 (1970).

[6]A broad application of the judicial integrity principle is also difficult to reconcile with the refusal of the Supreme Court to void convictions in cases in which the defendant has been brought before the court by illegal police methods. *E.g., Frisbie* v. *Collins,* 342 U.S. 519 (1952); *Ker* v. *Illinois,* 119 U.S. 436 (1886).

[7]Justice Black, who had concurred in *Mapp* on the ground that the Fourth and Fifth Amendments taken together demand exclusion of illegally obtained evidence in state trials, dissented in *Linkletter.* He wrote:

> [T]he undoubted implication of today's opinion that the rule is not a safeguard for defendants but is a mere punishing rod to be applied to law enforcement officers is a rather startling departure from many past opinions, and even from *Mapp* itself * * * I have read and reread the *Mapp* opinion but have been unable to find one word in it to indicate that the exclusionary search and seizure rule should be limited on the basis that it was intended to do nothing in the world except to deter officers of the law. [381 U.S. at 649.]

This logic has been consistently followed in subsequent cases refusing to give retroactive effect to new Fourth Amendment law. *See, e.g., Desist* v. *United States,* 394 U.S. 244 (1969) (denying retrospective application of *Katz* v. *United States,* 389 U.S. 347 (1967)).

The deterrence rationale has blossomed in several recent cases that have refused to extend the exclusionary rule to various proceedings outside the actual criminal trial or to apply new interpretations of the Fourth Amendment retrospectively. In *United States* v. *Calandra, supra,* the Court held that a witness testifying before a grand jury could not refuse to answer questions on the ground that the questions were based on illegally obtained evidence. The Court found that the burdens placed on the functioning of the grand jury were not outweighed by the deterrent value of the exclusionary rule. Justice Powell announced for the Court that the exclusionary rule's "prime purpose is to deter future unlawful police conduct." *Id.* at 348. The "imperative of judicial integrity" was relegated to a footnote responding to Justice Brennan's dissent. It stated simply "that 'illegal conduct' is hardly sanctioned * * * by declining to make an unprecedented extension of the exclusionary rule to grand jury proceedings where the rule's objectives would not be effectively served and where other important and historic values would be unduly prejudiced." *Id.* at 355 note 11.

In *United States* v. *Peltier,* 422 U.S. 531 (1975) (denying restrospective application of *Almeida-Sanchez* v. *United States,* 413 U.S. 226 (1973)), the Court again stressed the deterrent side of the exclusionary rule. Although Justice Rehnquist noted the "imperative of judicial integrity," he wrote for the Court that judicial integrity was not offended where the police reasonably believed in good faith that the evidence they seized was admissible at trial. *Id.* at 536–37. Thus, since the policeman could not know that his actions were illegal until announcement of the new rule, judicial integrity did not support retroactivity.

In *United States* v. *Janis, supra,* the Court in an opinion by Justice Blackmun held that the evidence seized by State officials in good faith, but unconstitutionally, need not be excluded in Federal civil tax proceedings. Applying the deterrence balance, it determined that the "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion." *Id.* at 454. Justice Blackmun dealt with judicial integrity in a footnote, which if followed by the Court would effectively render the doctrine inconsequential:

> The primary meaning of "judicial integrity" in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution. In the Fourth Amendment area, however, the evidence is unquestionably accurate, and the violation is complete by the time the evidence is presented to the Court * * * . The focus therefore must be on the question

whether the admission of the evidence encourages violations of Fourth Amendment rights. *As the Court has noted in recent cases, this inquiry is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose. [Id.* at 458 note 35. (Emphasis added.)]

Finally, in *Stone* v. *Powell, supra,* the Court held that Federal courts should not entertain State prisoner *habeas* petitions alleging Fourth Amendment violations unless the petitioner had not been afforded an opportunity for full and fair litigation of the claim in State court. The Court, through Justice Powell, determined that the deterrent value of the exclusionary rule was minimal in the *habeas* context. As to judicial integrity, the Court noted: "[w]hile courts, of course, must be ever concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." *Id.* at 485.

The import of these cases is clear. The Court believes that the "prime purpose of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.' *United States* v. *Calandra,* 414 U.S. 338, 347 (1974)." *United States* v. *Janis,* 428 U.S. at 446. The rise of deterrence as the sole criterion for application of the exclusionary rule has two consequences important here.[8]

First, with the attention of the courts focused on deterring illegal police activity, the exclusionary rule need no longer be considered part and parcel of the Fourth Amendment and the due process clause of the Fourteenth Amendment. *Mapp* had characterized the exclusionary rule as a "clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard," 367 U.S. at 643, which is "an essential ingredient of the Fourth Amendment." *Id.* at 651. And Justice Black concurred in *Mapp*

---

[8]The reliance upon deterrence appears to cut only one way: toward limiting applications of the exclusionary rule. To the extent that the exclusionary rule is divorced from the particular defendant, he or she becomes a private attorney general seeking to protect the rights of all against illegal police actions. Thus, under a strict deterrence analysis, the traditional standing doctrine should be discarded. However, the Court has very recently made clear that it will still only permit a defendant whose own Fourth Amendment rights have been violated to benefit from the exclusionary rule. *Rakes* v. *Illinois,* 439 U.S. 128 (1978). This holding is defended on the ground that "Fourth Amendment rights are personal rights" and thus a person against whom the evidence illegally seized from another is admitted "has not had any of his Fourth Amendment rights infringed." *Id.* at 133-34. This analysis seems in conflict with the Court's statement in *Calandra* that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 414 U.S. at 348. This apparent conflict is resolved, however, when one focuses on language in *Calandra* that states that the Fourth Amendment does not require "adoption of every proposal that might deter police misconduct," 414 U.S. at 350-51, particularly where the deterrent benefits of expanding standing are outweighed by the costs of further encroachment upon law enforcement. *See generally* Burkoff, "The Court that Devoured the Fourth Amendment: The Triumph of an Inconsistent Exclusionary Doctrine," 58 Ore. L. Rev. 151 (1979).

on the ground that from the Fourth and Fifth Amendments a "constitutional basis emerges which not only justified but actually requires the exclusionary rule." *Id.* at 622.[9]

The balancing analysis adopted by the Court in recent years, based on the costs and benefits of added deterrence, changes the constitutional grounding of the doctrine; as recast, the exclusionary rule need be invoked to protect Fourth Amendment rights only when it is deemed efficacious. *See, Stone* v. *Powell, supra; United States* v. *Calandra,* 414 U.S. at 348 ("In sum, the [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.")

The emphasis on the functional analysis openly invites alternative remedies that may equally well deter violations of Fourth Amendment rights. Presumably, once such remedies are in place, the exclusionary rule may simply be abolished. *See, Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 414 (1971) (Burger, C.J., dissenting). All that is demanded by the Constitution, in the words of Professor Kaplan, is "something that works * * * . The content of the particular remedial or prophylactic rule is thus a pragmatic decision rather than a constitutional fiat." Kaplan, "The Limits of the Exclusionary Rule," 26 Stan. L. Rev. 1027, 1030 (1974). *See also, California* v. *Minjares,* 100 S. Ct. 9, 14–15 (1979) (Rehnquist, J., dissenting from denial of stay).

The second consequence of a focus on deterrence is limitation of the exclusionary rule to situations in which the law enforcement officer has acted unreasonably or in bad faith. If the exclusionary rule is nothing more than a deterrent to illegal police conduct, it makes little sense to apply it in situations where it can have no deterrent force, particularly given the high societal costs generated by the rule's frustration of law enforcement. *See, Stone* v. *Powell,* 428 U.S. at 489–95. Thus, in numerous recent cases several Justices have suggested that the exclusionary rule not be applied to situations in which the police have acted in good faith, such as where agents have relied upon a warrant or a statute later held to be unconstitutional. *See, United States* v. *Scott,* 436 U.S. 128, 135–36 (1978) (Justice Rehnquist, in dicta, writing for the Court: "In view of the deterrent purposes of the exclusionary rule consideration of official motives may play some part in determining whether application of the exclusionary rule is appropriate *after* a statutory or constitutional violation has

---

[9]*See, United States* v. *Peltier,* 422 U.S. at 550–62 (Brennan, J., dissenting); *United States* v. *Calandra,* 414 U.S. at 356 (Brennan, J., dissenting):

> [Curtailment of police misconduct] if a consideration at all, was at best only a hoped-for effect of the exclusionary rule, not its ultimate objective. Indeed, there is no evidence that the possible deterrent effect of the rule was given any attention by the judges chiefly responsible for its formulation. Their concern as guardians of the Bill of Rights was to fashion an enforcement tool to give content and meaning to the Fourth Amendment's guarantees.

been established."); *Stone* v. *Powell,* 428 U.S. at 501–02 (Burger, C.J., concurring); *id.* at 538–42 (White, J., dissenting) (exclusionary rule should not apply where evidence was seized "by an officer acting in the good-faith belief that his conduct comported with existing law and having reasonable grounds for this belief"); *Brown* v. *Illinois,* 422 U.S. at 611–12 (concurring opinion by Powell, J., joined by Rehnquist, J.); *Michigan* v. *Tucker,* 417 U.S. 433, 447 (1974) (Rehnquist, J., for five members of the Court) ("Where the official action was pursued in complete good faith * * * the deterrence rationale loses much of its force."). *Cf., United States* v. *Caceres,* 440 U.S. 741 (1979) (refusing to exclude evidence where the Internal Revenue Service violated departmental procedure in good faith and without violating constitutional rights of defendant); *Michigan* v. *DeFillippo,* 99 S. Ct. at 2633, note 2 (purpose of deterrence not served by excluding evidence seized during lawful arrest under statute later held unconstitutional).[10]

### III. Congressional Power to Devise Alternatives

Although the exclusionary rule has been limited by the Court in this decade, it has remained a constitutional doctrine. *Mapp* was reaffirmed in *Stone* v. *Powell,* 428 U.S. at 481 (*see, id.* at 509–15 (Brennan, J., dissenting)); and *Mapp* is decidedly a constitutional decision. Indeed, for the exclusionary rule to apply to the States it must be a constitutional doctrine, for "no one * * * would suggest that [the] Court possesses any general supervisory power over the state courts." *Mapp* v. *Ohio,* 367 U.S. at 678 (Harlan, J., dissenting). *See, Murphy* v. *Florida,* 421 U.S. 794, 797–98 (1975); *id.* at 803–04 (Burger, C.J., concurring) (by implication); Cox, "The Role of Congress in Constitutional Determinations," 40 U. Cinn. L. Rev. 199, 251 (1971).[11]

---

[10] *See also,* Comment, "Judicially Required Rulemaking as Fourth Amendment Policy: An Applied Analysis of the Supervisory Power of Federal Courts," 72 Nw. U.L. Rev. 595, 598–99 (1977); Note, Reason and the Fourth Amendment—The Burger Court and the Exclusionary Rule," 46 Ford. L. Rev. 139, 168–69 (1977); *cf.* Israel, "Criminal Procedure, The Burger Court, and the Legacy of the Warren Court," 75 Mich. L. Rev. 1319, 1409–15 (1977); Schrock & Welsh, "Reconsidering the Constitutional Common Law," 91 Harv. L. Rev. 1117, 1160–61 (1978).

Even if the "imperative of judicial integrity" were still deemed to carry weight in exclusionary rule analysis, the Court has stated that "if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integrity' is not offended" by admission of the evidence at trial. *United States* v. *Peltier,* 422 U.S. at 537, quoted in *Stone* v. *Powell,* 428 U.S. at 485 n. 23. *See also, Stone* v. *Powell,* 428 U.S. at 540 (White, J., dissenting).

[11] Professor Monaghan has argued that the exclusionary rule, even though applied to the States, is something less than constitutional, and may be displaced by congressional remedies. *See* Monaghan, *supra* (note 5). His views, which are not easily reconciled with the words of *Mapp* and *Stone,* are thoughtfully and thoroughly criticized in Shrock & Welsh, "Reconsidering the Constitutional Common Law," *supra* (note 10). However, there are some indications in recent Supreme Court cases that lend support for the argument that the *Miranda* exclusionary rule is less than constitutional. *See, New Jersey* v. *Portash,* 440
(Continued)

497

Yet the fact that the exclusionary rule has constitutional roots does not mean it is constitutionally mandated. The Chief Justice's dissent in *Bivens* first suggested that congressional provision of an alternative remedy that would deter official misconduct as well as the exclusionary rule would permit the Court to abolish the rule. 403 U.S. at 411-24. As discussed above, this conclusion flows logically from reliance on the deterrence rationale.[12] If the defendant has no personal right to exclusion of illegally seized evidence, then any remedy that adequately protects Fourth Amendment guarantees should meet the constitutional requirement that the Fourth Amendment not be rendered a "form of words."[13] This conclusion is supported by each of the scholars consulted by the Senate Judiciary Committee.

In other similar situations the Court has openly invited Congress to enact legislation that could supplement or supplant judicially created prophylactic rules. In declaring the *Miranda* rules to protect the Fifth Amendment rights of subjects of police interrogation, the Court wrote:

> It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws. However, unless we are shown other

---

(Continued)

U.S. 450 (1979) (use of immunized grand jury testimony for impeachment is unconstitutional; distinguishing cases permitting impeachment use of evidence obtained in violation of *Miranda* on ground that in those cases no coercion was present); *North Carolina* v. *Butler,* 60 L. Ed. 2d 286, 294 (1979) (Blackmun, J., concurring) (suggesting that standard for waiver of lawyer after *Miranda* warnings is different than standard applied for waiver of "fundamental constitutional rights" as established by *Johnson* v. *Zerbst,* 304 U.S. 458 (1938)).

[12]Chief Justice Burger also believes that the existence of an effective alternative would satisfy the demands of judicial integrity: "Nor is it easy to understand how a court can be thought to endorse a violation of the Fourth Amendment by allowing illegally seized evidence to be introduced against a defendant if an effective remedy is provided against the government." 403 U.S. at 414.

[13]Justice Brennan continues to argue that the exclusionary rule is "part and parcel" of the Fourth Amendment. This argument, made in dissent, does not appear to reflect the views of the Court as presently constituted. *See, e.g., United States* v. *Calandra,* 414 U.S. at 355-67 (Brennan, J., dissenting); *see also, Wolf* v. *Colorado,* 338 U.S. at 48 (Rutledge, J., dissenting) ("I * * * reject any intimation that Congress could validly enact legislation permitting the introduction in federal courts of evidence seized in violation of the Fourth Amendment"). For an extensive argument that the exclusionary rule is constitutionally mandated, *see* Schrock & Welsh, "Up from Calandra," *supra* (note 4).

procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be · observed * * * .[14] [384 U.S. 436, 467 (1966). *See, id.* at 444, 478-79.]

Similarly, in the "line-up" cases, *United States* v. *Wade,* 388 U.S. 218, 239 (1967) and *Gilbert* v. *California,* 388 U.S. 263, 273 (1967), the Court noted that its prophylactic procedures were necessary in the absence of State or Federal rules that eliminated the risks of abuse attending line-up identifications.

In sum, given the emphasis on the exclusionary rule as a tool of deterrence and analogies to related areas where the Supreme Court has laid down protective rules while inviting prophylactic legislation, we believe the Supreme Court would hold that enactment by Congress on an alternative remedy that is as effective as the exclusionary rule ˙in deterring violations of the Fourth Amendment would obviate the constitutional necessity for the exclusionary rule. This conclusion raises two additional questions: what alternative remedies are equally effective, and who is the judge of the effectiveness of the alternative.

Answering the second question first, we believe that it is the Supreme Court that must ultimately decide whether an alternative remedy adequately protects the Fourth Amendment from becoming a "form of words." *See, Bivens* v. *Six Unknown Named Agents,* 403 U.S. at 423 note 7 (Burger, C.J., dissenting) (by implication); Dellinger, "Of Rights and Remedies: The Constitution as a Sword," 85 Harv. L. Rev. 1532, 1548, 1552-53 (1972); Note "Excluding the Exclusionary Rule: Congressional Assault on *Mapp* v. *Ohio,*" 61 Geo. L. Rev. 1453, 1471 (1973). This is no more than recognition of the Court's traditional duty to measure congressional legislation against the Constitution. *Marbury* v. *Madison,* 1 Cr. 137 (1803). If the Constitution demands some remedy for effectuation of the Fourth Amendment, then it is the province of the Court to decide whether proffered alternatives meet constitutional requirements. The Court may find congressional factfinding persuasive, and it is likely to accord deference

---

[14]Congress accepted the Court's invitation, but in a manner intended to limit the reach of *Miranda* rather than provide adequate alternative safeguards. 18 U.S.C. § 3501, Title II of the 1968 Omnibus Safe Streets and Crime Control Act. Although courts have avoided ruling on the issue, *see, e.g., United States* v. *Crook,* 502 F.(2d) 1378 (3d Cir. 1974), cert. denied, 419 U.S. 1123 (1975); *Ailsworth* v. *United States,* 448 F.(2d) 439 (9th Cir. 1971), the provi- ·sion is of doubtful constitutionality. *See* Wright & Miller, *Federal, Practice and Criminal Procedure,* § 76, at 120-22 (1969); Gandara, "Admissibility of Confessions in Federal Prosecutions: Implementation of Section 3501 by Law Enforcement Officials and the Courts," 63 Geo. L.J. 305 (1974). Imaginative defenses for § 3501 have been constructed. It has been asserted that *Miranda* was based on factual assumptions about the coerciveness of custodial interrogations—assumptions that Congress has the power to reverse through its factfinding procedures. Alternatively, it has been argued that Congress has power under § 5 of the Fourteenth Amendment, as interpreted by *Katzenbach* v. *Morgan,* 384 U.S. 641 (1966), to revise constitutional decisions of the Court. *See* S. Rept. 1097, 90th Cong., 2d sess. (1968). *See generally* Burt, "Miranda and Title II: A Morganatic Marriage," (1969) S. Ct. Rev. 81.

to the expressed judgment of Congress that the legislative alternatives are efficacious. But it remains up to the Court to render final judgment on what the Constitution demands. *See, Miranda* v. *Arizona,* 384 U.S. at 490.

Evaluating the likely effectiveness of alternatives to the exclusionary rule—such as police training and regulations, tort actions, criminal prosecutions, or contempt proceedings—is a difficult task. An initial problem is that it is unclear what yardstick of effectiveness should be used because the empirical evidence on the deterrent effect of the exclusionary rule is conflicting at best. *Compare, United States* v. *Janis,* 428 U.S. at 448–53, *with, Elkins* v. *United States,* 364 U.S. at 218; *compare, Oaks, supra* (note 5), *with* Critique, "On the Limitations of Empirical Evaluations of the Exclusionary Rule," 69 Nw. U.L. Rev. 740 (1974). The court has recently tended to express doubt about the rule's efficacy beyond its application at a criminal trial, and this view has been shared by many commentators. *See, e.g., United States* v. *Janis,* 428 U.S. at 448–53 and accompanying footnotes; *Oaks, supra;* Wilkey, 62 Judicature 215, 222-23 (1978).

However, the Court's growing disillusionment with the efficacy of the exclusionary rule is in tension with the earlier cases that held that the exclusionary rule was the only effective means of guaranteeing that the Fourth Amendment would not become a form of words. Indeed, *Mapp's* reversal of *Wolf's* holding (which had left State protection of the Fourth Amendment to other than exclusionary remedies) stated that applying the Fourth Amendment without the exclusionary rule "is to grant the right but in reality to withhold its privilege and enjoyment * * *. [T]he purpose of the exclusionary rule '[is] to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' *Elkins* v. *United States,* [364 U.S.] at 217." *Mapp* v. *Ohio,* 367 U.S. at 656.[15]

These statements could be viewed as hyperbole or makeweights for Justices who believed that the exclusionary rule was constitutionally mandated in any event. However, similar language has appeared in a recent case. In *Franks* v. *Delaware,* 438 U.S. 154 (1978), the Court held that a defendant could attack the veracity of affidavits supporting a search warrant, and that a court could exclude evidence obtained pursuant to the warrant if it determined that police officers had made deliberate misstatements in the affidavits and that the affidavits were necessary to a finding of probable cause. In describing the general considerations supporting a rule of exclusion, Justice Blackmun, writing for seven Justices, stated:

> [T]he alternative sanctions of a perjury prosecution, administrative discipline, contempt, or a civil suit are not likely to fill the gap. *Mapp* v. *Ohio* implicitly rejected the adequacy of

---

[15]*See also, Terry* v. *Ohio,* 392 U.S. 1, 12 (1968) ("experience has taught that [the exclusionary rule] is the only effective deterrent to police misconduct"); *Lee* v. *Florida,* 392 U.S. 378, 386–87 (1968) ("nothing short of mandatory exclusion of the illegal evidence will compel respect for the federal law"); *Linkletter* v. *Walker,* 381 U.S. at 634; *Wolf* v. *Colorado,* 338 U.S. 25, 41 (1949) (Murphy, J., dissenting) ("[T]here is but one alternative to the rule of exclusion. That is no sanction at all").

these alternatives. Mr. Justice Douglas noted this in his concurrence in *Mapp,* 367 U.S., at 670, where he quoted from *Wolf* v. *Colorado,* 338 U.S. 25, 42 (1949): " 'Self-scrutiny is a lofty idea, but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered.' " [*Id.* at 169.]

It is not easy to know what to make of these words. We believe that, at the very least, the Court may demand congressional factfinding concerning the efficacy of alternatives. We doubt that an adequate showing will be easy.[16] Alternatives that existed prior to *Mapp*—e.g., a § 1983 action against State officers, a criminal prosecution, or prosecution under the civil rights laws, *see, Irvine* v. *California,* 347 U.S. 128, 137–38 (1954) (suggestion of Warren, C.J., and Jackson, J.)—should clearly be rejected as inadequate. *Cf., Wolf* v. *Colorado,* 338 U.S. at 41–47 (1949) (Murphy, J., dissenting); *People* v. *Cahan,* 44 Cal. 2d 434, 445–48 (1955). The efficacy of any remedies enacted since *Mapp* are essentially untested because the exclusionary rule was in place at the same time. Yet abandonment of the exclusionary rule in order to test new alternatives, such as those in the proposed amendments to the FTCA, is to risk rendering the Fourth Amendment a dead letter if the remedies fail. In short, the Court will be faced with little hard data on either side of the equation; it will have to measure the unknown deterrent value of the exclusionary rule against the untested deterrent value of the alternative.

This conclusion, however, does not necessarily mean that the Supreme Court would find a tort-disciplinary scheme an inadequate alternative. The problems associated with the exclusionary rule—such as permitting guilty defendants to go free, fostering police perjury, and not compensating victims of illegal searches who do not go to trial—measured against the better "fit" of the tort-discipline alternative may tip the Court toward accepting the alternative as at least as effective as the exclusionary rule, and therefore constitutional. This decision would be aided by the Court's traditional deferrence to legislative factfinding. *See, Oregon* v. *Mitchell,* 400 U.S. 112, 240, 246–49 (1970) (opinion of Brennan, White, and Marshall, J.J.); Burt, *supra* (note 14), at 112–14; Cox, *supra,* at 228–29; *cf., Regents of the Univ. of California* v. *Bakke,* 438 U.S. 265, 302 note 41 (1978) (opinion of Powell, J.).

---

[16]Two recent studies, taken together, lend further support for the position that alternative remedies may be no more effective in deterring violations of the Fourth Amendment than the exclusionary rule. *Compare* Project, "Suing the Police in Federal Court," 88 Yale L.J. 781 (1979) (§ 1983 actions not effective deterrents of police misconduct) *with* Report by the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions (C.A.O. April 19, 1979) (Federal prosecutors decline few prosecutions on the basis of Fourth Amendment problems; open to interpretation that compliance with Amendment's dictates is substantial given present reliance upon exclusionary rule).

## IV. Conclusions

We have been asked to consider whether, assuming enactment of remedies similar to the proposed amendment to the FTCA, Congress may constitutionally limit or eliminate the exclusionary rule in Federal criminal proceedings. We believe that Congress may not, without more, "repeal" the exclusionary rule. The rule, in the absence of alternative remedies, is constitutionally mandated. However, Congress may provide the occasion for judicial repeal of the exclusionary rule by enacting alternative remedies. The Court, in its traditional exercise of judicial review, could then analyze whether the legislative alternatives adequately protect Fourth Amendment guarantees. Although two decades ago the Court might have deemed the exclusionary rule itself part and parcel of the Fourth Amendment and therefore not subject to legislative abolition, we believe that the Court's redefinition of the rule in terms of deterrence would constitutionally permit the rule's demise in the face of efficacious alternatives. We have identified some of the difficulties implicit in evaluating the deterrent potential of alternative remedies.

Applying these general conclusions to the draft Senate Judiciary Committee bill, we believe that it would be sustained as constitutional. The Court is likely to determine that the alternative remedy provided by the FTCA adequately protects Fourth Amendment rights, and therefore would sustain the abolition of the exclusionary rule. This conclusion is strengthened by the fact that the draft bill eliminates the exclusionary rule only for good faith violations of the Fourth Amendment. This is a limitation that the Court may well be willing to impose on its own even in the absence of alternative remedies.[17]

Our conclusion concerning the Court's likely reaction to the proposed legislation is descriptive, not normative. Although Congress and the Court may be willing to substitute amendments to the FTCA for the exclusionary rule, we are not convinced that the Department should support the constitutional minimum.

We believe that there are good reasons to question the adequacy of the proposed amendments to the FTCA. The substitution of the United States as the defendant will mean that any monetary recovery will be paid from the U.S. Treasury, and not by the Federal law enforcement officer involved. It has been asserted that ultimate taxpayer liability will generate public demands for law-abiding police, *see, e.g.,* Wilkey, 62 Judicature 215, 231 (1978); whatever force this has on the State level, we believe that it is tenuous at best when applied to the Federal fisc. This conclusion has empirical support. *See* Project, "Suing the Police in Federal Court," 88 Yale L.J. 781 (1979). Thus the only deterrent for the law enforcement

---

[17]It should be noted that enactment of the proposed legislation will have the anomalous result of abolishing the exclusionary rule in the Federal courts but not the State courts. Of course, passage of the proposal may well spur the Court to reevaluate *Mapp* v. *Ohio, supra,* as recently urged by Justice Rehnquist. *California* v. *Minjares,* 100 S. Ct. 9 (1979) (Rehnquist, J., dissenting from a denial of a stay).

officer on the street is the disciplinary proceeding that may be convened. The proposal is silent as to the standards of responsibility that are to be applied in such a proceeding. Presumably, the police officer would be able to assert a good-faith defense since it would be unfair to subject him to administrative sanctions if he was carrying out his duties in a manner that a reasonable officer would believe was lawful. *Cf., Wood* v. *Strickland,* 420 U.S. 308 (1975); *United States* v. *Norton,* 581 F. (2d) 390, 393 and note 2 (4th Cir.) (citing cases), cert. denied, 439 U.S. 1003 (1978); *Bivens* v. *Six Unknown Named Agents,* 456 F. (2d) 1339, 1348 (2d Cir. 1972) (on remand). Yet the likelihood of a person (particularly a convicted defendant) overcoming a good-faith defense is notoriously low. *See, Bivens* v. *Six Unknown Named Agents,* 403 U.S. at 421 (Burger, C.J., dissenting). In short, the deterrent effect of the proposals on the police may be little or no more direct or effective than the exclusionary rule. Indeed, some have suggested that the likely effect of the proposed amendments is that the Government would be able to "buy" convictions by paying liquidated damages for Fourth Amendment violations. *See* Dellinger, *supra,* 85 Harv. L. Rev. at 1563. Such a remedy may well provide adequate compensation to a person who has been the subject of an illegal search or seizure; but it may do little to stop the Fourth Amendment from becoming a "form of words."

While we are deeply concerned about the ability of the tort remedy to deter violations of the Fourth Amendment, we also recognize that the amendments to the FTCA are important in that they extend remedies to persons who presently receive no relief after their Fourth Amendment rights are violated. Thus, we would suggest enactment of the FTCA amendments and continued adherence to the exclusionary rule. If, after an appropriate period of time, it becomes empirically apparent that the tort-discipline remedy provides adequate deterrence, then we believe that it would be time to reconsider the exclusionary rule. It may be sensible to amend the draft legislation to include a direction to the Department of Justice that it monitor over several years the effectiveness of the FTCA remedy and report to Congress. This proposal will supply an orderly process for abolition of the exclusionary rule, if abolition is empirically supportable. Of course, such a strategy could be frustrated if the Court on its own declared that existence of the new remedies obviated the need for the exclusionary rule. Congress could forestall the rule's untimely demise by making clear that its legislation was experimental and not to be deemed an alternative to the exclusionary rule. The legislation might expressly provide, for example, that Congress will consider the evidence and the wisdom of abolition of the exclusionary rule at some specific future date.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*