AUGUST 22, 1979

No. A–2 (79–145). CALIFORNIA *v.* MINJARES. Application for recall and stay of mandate of the Supreme Court of California, addressed to MR. JUSTICE BLACKMUN and referred to the Court, denied. MR. JUSTICE BLACKMUN would grant the application.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting from denial of stay.

In the ordinary case, anything more than the most summary statement of the reasons of an individual Justice for dissenting from the disposition of an application for a stay by the full Court would be both a useless and wasteful consumption of the dissenter's time. I believe, though, that this is not the ordinary case, but the culmination of a sport of fox and hound which was begun by this Court's decision in *Weeks* v. *United*

*States,* 232 U. S. 383 (1914), 65 years ago. So many factors material to that decision, and to *Mapp* v. *Ohio,* 367 U. S. 643 (1961), which applied it to the States, have occurred after the rendition of these decisions that I think a re-evaluation of the so-called "exclusionary rule" enunciated by *Weeks* is overdue. Because of double jeopardy considerations, I am not prepared to state flatly that this case would not be moot as a result of a verdict of acquittal by the time this Court comes to pass on the State's petition for certiorari, and I am therefore filing this opinion as a dissent from the denial of a stay of the judgment of the Supreme Court of California suppressing evidence, the granting of which could prevent any possibility of mootness. See *Fare* v. *Michael C.,* 439 U. S. 1310 (1978) (REHNQUIST, J., in chambers).

The anomalous consequences of the exclusionary rule are readily apparent from an examination of the police conduct in this case. The officers who conducted the search were responding to a report of a robbery that had recently been committed. The robbery took place around 8:30 p. m. on December 19, 1975, at a Safeway Store in Fremont, Cal. It was committed in the presence of several witnesses by two individuals armed with handguns. One of the witnesses followed the two men, observed them get into a car, and trailed the car for several miles until he was able to identify it as a 1968 or 1969 Ford Fairlane and to write down the license number. The witness then went directly to the police station and reported what he had seen. At approximately 9 p. m., the police department broadcast a description of the getaway vehicle and its license number. Shortly thereafter, a Fremont police officer spotted a vehicle matching the description, called for backup units, and stopped the vehicle. The driver, respondent, was ordered out of the car, searched, and advised he was under arrest for robbery. He was the only person in the vehicle and fit the description of one of the suspects. The officers also searched the passenger compartment of the car,

but neither that search nor the search of respondent revealed any evidence of the crime or the whereabouts of the second robber. After an unavailing attempt to locate the key to the car's trunk, the officers had the car towed to the city corporation yard. Upon its arrival, the officers picked the lock to the trunk and discovered it contained a red tote bag. They opened the tote bag, which contained clothing similar to that described by witnesses to the robbery, three guns, and a roll of pennies in a wrapper from the bank used by Safeway.

When the officer who initially stopped the vehicle was asked why he did not obtain a warrant while "making the decision to search the car and the trunk," he stated: "Basically, I think, time. In other words, by searching without the search warrant, we would save a matter of hours." He was then asked why time was a factor at this stage, and responded: "Well, we were still looking for a second suspect." The trial court denied respondent's motion to suppress the evidence discovered in the tote bag. Respondent was convicted of two counts of first-degree robbery and was found to have been armed at the time of his arrest. The Supreme Court of California, however, reversed the conviction. It concluded that although a warrantless search of an automobile, if based on probable cause to believe that the auto contains contraband or evidence of a crime, is permissible when it takes place after the auto has been towed to a police station, *Chambers* v. *Maroney*, 399 U. S. 42, 52 (1970), a search of a container in the automobile is invalid unless the officers first obtain a warrant.

The foregoing discussion reveals that respondent was apprehended as a result of conscientious police work, and that the subsequent search of the trunk of his auto occurred in the course of an ongoing investigation, while the second suspect was still on the loose. The case is thus not one in which the officers lacked probable cause to arrest respondent and to search the trunk of his auto and the tote bag; it appears rather that "the criminal is to go free" solely because of a good-faith

error in judgment on the part of the arresting officers, who were not sufficiently prescient to realize that while it was constitutionally permissible for them to search the trunk of an automobile at the city corporation yard under the exigency exception to the warrant requirement, courts would later draw a distinction between searching the trunk and searching a tote bag in the trunk. This distinction would obtain even though it was equally likely that the tote bag contained the evidence they were looking for, and they had no reason, prior to opening the trunk, to anticipate that such evidence might be hidden from their view because it was in the tote bag.

I do not claim to be an expert in comparative law, but I feel morally certain that the United States is the only nation in the world in which the most relevant, most competent evidence as to the guilt or innocence of the accused is mechanically excluded because of the manner in which it may have been obtained. *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 415 (1971) (BURGER, C. J., dissenting); see also *Stone* v. *Powell*, 428 U. S. 465, 499 (1976) (BURGER, C. J., concurring). This unique jurisprudential rule, as discussed in *Stone* v. *Powell,* imposes tremendous costs on the judicial process at criminal trials and on direct review:

> "The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman:*
>
>> " 'A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence

seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty.' 394 U. S., at 237.

"Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." *Id.,* at 489–491 (footnotes omitted).

If I am correct in this belief, the Court has made a wrong turn at some point between its decision in *Weeks,* 65 years ago, and the present case. See Burger, Who Will Watch the Watchman?, 14 Am. Univ. L. Rev. 1 (1964).

In *Weeks,* the Court held, almost casually, that evidence seized in violation of the Fourth Amendment was inadmissible against the accused at a federal criminal trial. *Weeks* was decided in 1914 when the federal Criminal Code was still a rather slim volume. The villains of the 1914 federal Code, and thus the beneficiaries of the *Weeks* rule, were smugglers, federal income tax evaders, counterfeiters, and the like. The defendant in *Weeks* itself was charged with the unlawful use of the mails to transport lottery tickets. It is quite conceivable that society can tolerate an occasional counterfeiter or smuggler going unwhipped of justice because of what seems to the great majority of the citizens of the country to be a technical violation of the rights secured to him by the Fourth Amendment to the United States Constitution. The societal reaction

could be expected to be quite different today, when *Weeks* serves to free the perpetrators of crimes affecting life and property, crimes which have traditionally been the principal responsibility of the States to enforce and administer.

In *Byars* v. *United States,* 273 U. S. 28 (1927), the Court held that "probable cause" could only be measured by objective facts known to the police officer prior to the search. The search in *Byars* was conducted pursuant to a warrant supported by the affiant's statement that he had "good reason" to believe that the defendant had intoxicating liquors and related articles in his possession. The search proved the affiant correct, producing whiskey-bottle stamps. The Court held that the search was conducted in violation of the Fourth Amendment, because under Fourth Amendment standards, it was not "material that the search was successful in revealing evidence of a violation of a federal statute." *Id.,* at 29. This result, while taken for granted today, was not inevitable. The Court certainly could have held that discovery of the articles sought is compelling evidence that the search was justified, or that any violation of the Fourth Amendment in such a case was harmless error.

In *Wolf* v. *Colorado,* 338 U. S. 25 (1949), the Court held that the Fourth Amendment was applicable to the States by incorporation through the Fourteenth Amendment. This was, and remains, a thoroughly defensible proposition. Equally defensible, was the proposition established by Mr. Justice Frankfurter's majority opinion that the exclusionary rule of *Weeks* was not a necessary concomitant of the Fourth Amendment. In a 6–3 decision, the Court held that although the Fourth Amendment applied against the States, the States were free to choose any number of means of enforcing the Fourth Amendment and were not required to adopt the exclusionary rule. Mr. Justice Frankfurter relied on Judge Cardozo's opinion in *People* v. *DeFore,* 242 N. Y. 13, 150 N. E. 585 (1926), concluding that the exclusionary rule would not be applied in New

York. Cardozo's reasoning was cogently summarized in his conclusion that there was no reason why "[t]he criminal is to go free because the constable has blundered." *Id.*, at 21, 150 N. E., at 587.

Mr. Justice Murphy wrote a dissenting opinion in which Mr. Justice Rutledge joined. (Mr. Justice Douglas dissented separately.) Mr. Justice Murphy's dissent was premised on the belief that the exclusionary rule was the only effective sanction for violations of the Fourth Amendment. He therefore concluded that application of the Fourth Amendment to the States without application of the exclusionary rule was a nullity.

Twelve years later, by a vote of 6–3 in the case of *Mapp* v. *Ohio*, 367 U. S. 643 (1961), this Court overruled *Wolf* v. *Colorado* (MR. JUSTICE STEWART concurred in the judgment on independent grounds without reaching the Fourth Amendment issues). The Court held that the Fourteenth Amendment did incorporate the exclusionary rule and therefore adherence to that rule by the States was mandatory. The Court essentially adopted the reasoning of Mr. Justice Murphy's *Wolf* dissent, concluding that the exclusionary rule represented the only feasible means of enforcing the Fourth Amendment. The *Mapp* majority opinion, written by Mr. Justice Clark, adopted the view, espoused by Mr. Justice Murphy, that a person injured by a Fourth Amendment infraction had no effective redress available. Police officers were generally impecunious, preventing the recovery of money damages, and county prosecutors who secured the conviction through use of the illegally seized evidence would be unlikely to prosecute the police officers responsible for producing the evidence.

*Mapp* was decided only 18 years ago. Application of the exclusionary rule to the States is not supported by a long tradition of history in its favor. It should therefore be judged freely by its reason. Moreover, one of the central themes in the procession of cases from *Weeks* to the present day has been a continuing re-evaluation of past assumptions. Thus,

*Mapp* reassessed the factual and conceptual underpinnings of *Wolf* in light of intervening cases and empirical data. See 367 U. S., at 651–653. Events that have intervened in the 18 years since *Mapp* and the 65 years since *Weeks* lead me to believe that another such reassessment is in order. The justifications for a rule once found compelling may no longer withstand scrutiny.

*Weeks,* the seminal case on the necessity for the exclusionary rule, seemed grounded upon an interpretation of the Fourth Amendment itself. In holding· that illegally seized evidence must be excluded in federal prosecutions, this Court reasoned that if illegally seized evidence were admissible, "the protection of the Fourth Amendment declaring [a] right to be secure against such searches and seizures is of ¦no value, and . . . might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." 232 U. S., at 393–394. Despite *Weeks'* linkage of the exclusionary rule with the fundamental guarantees of the Fourth Amendment, this Court held in *Wolf* that the protections of the rule were not fundamental enough to merit incorporation through the Fourteenth Amendment. In *Mapp,* which overruled that portion of *Wolf,* a plurality of this Court implied that the exclusionary rule was a necessary corollary of the Fourth Amendment. See 367 U. S., at 655–657. Mr. Justice Black, in a concurrence, indicated that the Fourth Amendment had to be read in conjunction with the Fifth in order to justify the exclusionary rule. See *id.,* at 661; see also *Stone* v. *Powell,* 428 U. S., at 484 n. 21.

More recently, however, we have rejected the argument that

the Fourth Amendment mandates exclusion of evidence as a necessary corollary to its guarantees against unreasonable searches. In *Stone* v. *Powell,* for example, we "reaffirm[ed] that the exclusionary rule is a judicially created remedy rather than a personal constitutional right . . . ." *Id.,* at 495 n. 37. This distinction manifests itself in those cases where we have permitted admission of illegally seized evidence because its exclusion would serve no deterrent purpose. See, *e. g., United States* v. *Calandra,* 414 U. S. 338 (1974) (exclusionary rule not applicable to grand jury proceedings). Clearly, proponents of the exclusionary rule must look beyond the corners of the Fourth Amendment for support.

A direct descendant of the constitutional rationale for the exclusionary rule is the argument that the rule somehow maintains the integrity of the judiciary. This argument received a full exposition in *Elkins* v. *United States,* 364 U. S. 206 (1960). There, this Court relied upon its "supervisory power over the administration of criminal justice in the federal courts," and rejected the "silver platter" doctrine under which federal authorities prosecuted defendants with evidence seized illegally by state authorities. This practice, according to *Elkins,* made federal courts "accomplices in the willful disobedience of a Constitution they are sworn to uphold." *Id.,* at 223. In *Mapp,* this Court also relied upon the "judicial integrity" argument, even though we have no supervisory powers over the conduct of state courts.

There are several answers to the assertion that courts should exclude illegally seized evidence in order to preserve their integrity. First, while it is quite true that courts are not to be participants in "dirty business," neither are they to be ethereal vestal virgins of another world, so determined to be like Caesar's wife, Calpurnia, that they cease to be effective forums in which both those charged with committing criminal acts and the society which makes the charge may have a fair trial in which relevant competent evidence is received in order to determine whether or not the charge is true. As Mr. Jus-

tice Stone noted in *McGuire* v. *United States,* 273 U. S. 95, 99 (1927), "[a] criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule."

Moreover, the judicial-integrity justification has on more than one occasion failed to persuade this Court. In *United States* v. *Peltier,* 422 U. S. 531 (1975), the Court observed that it had consistently refused to apply newly announced doctrines of search-and-seizure law retroactively. In such cases, the Court has recognized that the introduction of evidence which had been seized by law enforcement officials in good-faith compliance with then-prevailing constitutional norms did not make the courts "accomplices in the willful disobedience of a Constitution they are sworn to uphold." Similarly, in *Stone* v. *Powell,* we asserted that "[w]hile courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." 428 U. S., at 485. Although someone undoubtedly should be disciplined when a deliberate violation of the Fourth Amendment occurs, that proposition does not require the conclusion that the whole criminal prosecution must be aborted to preserve judicial integrity.

Of course, the "primary" justification for the exclusionary rule is the need for deterrence of illegal police conduct. See *Stone* v. *Powell,* 428 U. S., at 486. But since *Mapp,* various changes in circumstances make redress more easily obtainable by a defendant whose constitutional rights have been violated.

Four months prior to the decision in *Mapp,* this Court resurrected a long-dormant statute, § 1 of the Ku Klux Act, 42 U. S. C. § 1983, which gave a private cause of action for redress of constitutional violations by state officials. *Monroe* v. *Pape,* 365 U. S. 167 (1961). The subsequent developments in this area have, to say the least, expanded the reach of that statute. *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), made not only the individual police offi-

cer who may have committed the wrong, and who may have been impecunious, but also the municipal corporation which employed him, equally liable under many circumstances. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), made individual agents of the Federal Bureau of Narcotics suable for damages resulting from violations of Fourth Amendment guarantees. In addition, many States have set up courts of claims or other procedures so that an individual can as a matter of state law obtain redress for a wrongful violation of a constitutional right through the state mechanism.

In his dissent in *Wolf* v. *Colorado,* Mr. Justice Murphy disparaged civil actions as a remedy for illegal searches and seizures. Some of his objections have been vitiated by *Monroe*'s provision of a federal forum for the dispute or by *Monell*'s provision of a deep state pocket. As for other concerns voiced by Mr. Justice Murphy, I believe that modern juries can be trusted to return fair awards in favor of injured plaintiffs who allege constitutional deprivations. If, as this Court announced in *Rogers* v. *Missouri Pacific R. Co.,* 352 U. S. 500 (1957), juries are capable of awarding damages as between injured railroad employees and railroads, they surely are capable of awarding damages as between one whose constitutional rights have been violated and either the agent who or the government agency that violated those rights. Thus, most of the arguments advanced as to why the exclusionary rule was the *only* practicable means for enforcing the Fourth Amendment, whether or not they were true in 1949 or 1961, are no longer correct.

The most comprehensive study on the exclusionary rule is probably that done by Dallin Oaks for the American Bar Foundation in 1970. See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970). According to this article, it is an open question whether the exclusionary rule deters the police from violating Fourth Amendment protections of individuals. Whether or not this

be the case, the exclusionary rule certainly deters the police and prosecuting authorities from convicting many guilty defendants.

There is no question that the police are badly in need of rules that may be relatively easily understood in carrying out their work of apprehending and assisting in convicting those guilty of conduct made criminal by the legislature. There is equally no doubt that those who have been damaged by official action infringing on rights guaranteed them by the Constitution should have an avenue for redress of that damage. But it does not at all follow from either of these statements that the forum for redress of the individual's rights and the forum in which the police officer learns of the limitations on his authority should be one and the same. It would be quite rational, I think, for the criminal trial to take place either without any application of the exclusionary rule in either federal or state cases, or at least without any application in state cases. A difference in approach between state and federal prosecutions could be justified on the basis of the different roles that state and federal law enforcement officials play in our society, even today. See, *e. g., Cady* v. *Dombrowski,* 413 U. S. 433, 440–441 (1973). Not only has the list of federal criminal statutes greatly expanded since 1914, but also crimes against person and property—the traditional common-law crimes—have largely remained the preserve of the State. Thus, *Mapp* v. *Ohio* brought to bear in favor of accused murderers and armed robbers a rule which had previously largely had an application to bootleggers and purveyors of stolen lottery tickets through the mail. This difference is not without force in any reasoned perception by the members of the society of how well the system of administration of criminal justice as a whole is working.

The reasons for applying the exclusionary rule in the criminal trial, as opposed to giving the individual criminal defendant redress in some other forum quite apart from the question whether he is guilty or not of the criminal charges,

are substantially weaker today than they were either in 1949, when *Wolf* v. *Colorado* was decided, or in 1961, when *Mapp* v. *Ohio* was decided. Given these changes, I would grant the stay and request the parties and the Solicitor General to brief the question of whether, and to what extent, the so-called "exclusionary rule" of *Weeks* v. *United States* should be retained.