**UNITED STATES of America,**

v.

**Charles R. BROWN, Appellant.**
**(2 Cases).**

**Nos. 77–2106, 78–1646.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Oct. 20, 1980.

Decided Aug. 10, 1981.

Ellen Sue Shapiro, Washington, D. C. (Appointed by this Court), for appellant.

Michael W. Farrell, Asst. U. S. Atty., Charles F. C. Ruff, U. S. Atty., John A. Terry, Paul N. Murphy, and Stephen R. Spivack, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before ROBINSON, Chief Judge, and WRIGHT, McGOWAN, TAMM, MacKIN-NON, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge ROBB.

Concurring opinion filed by Circuit Judge WILKEY.

ROBB, Circuit Judge:

On the afternoon of July 5, 1977 Officers Harvey, Robinson and Galante of the Metropolitan Police Department were patrolling in a police vehicle on T Street, N.W., in the City of Washington. Harvey was driving. The officers saw the defendant Brown in a kneeling position, peering through the mail slot in the door of a basement apartment at 1500 T Street. Harvey stopped the police car and Officers Robinson and Galante got out and went up the walk toward Brown. As the officers approached, identifying themselves as police, Brown stood up, looked over his shoulder at them, and "started knocking on the front door." At this time when the policemen were about a foot away from him, Brown "threw" (Officer Robinson's Testimony, TR. 66, 67, 96) or "shoved" (Officer Galante's testimony, TR. 105, 106) a brown paper bag into a bush growing in a tree box to the left of the front door. The bush was approximately two feet six inches tall and the paper bag lodged in its lower branches. Officer Robinson recovered the bag which contained 57 glassine bags of heroin. The heroin was divided evenly among the bags and had a "street value" of approximately $5,000. When Brown was searched at the stationhouse the police found in his shirt pocket a sheet of notebook paper recording the names of persons to whom drugs had been sold and the amount of money owed for the drugs. Brown also had four empty glassine bags in his pants pocket.

After a jury trial Brown was convicted of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841 (1977). He appealed. He also appealed the denial of his motion for a new trial based upon the alleged incompetency of his trial counsel [1] in failing to file a pretrial motion to suppress the evidence against him. A panel of this court, one judge dissenting, held that Rule 12(f) of the Federal Rules of Criminal Procedure "does not bar consideration of appellant's suppression claim"; and the panel remanded the record to the District Court "for consideration of that issue." The panel found that the "record establishes the requisite cause for relief under Rule 12" in that "trial counsel made a serious misjudgment in not filing a suppression motion." *United States v. Brown*, No. 77–2106 (D.C.Cir., Mar. 21, 1980).

Rule 12(f), Fed.R.Crim.P. provides:

*Effect of Failure to Raise Defenses or Objections.* Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

The government's suggestion for *rehearing en banc* having been granted and argument heard by the court siting *en banc*, we now vacate the opinion of the panel and affirm the judgment of the District Court.

The record discloses that Brown's trial counsel was an experienced criminal lawyer. At the hearing on the motion for a new trial he testified that 90% of his practice consisted of criminal cases. In those cases search and seizure questions frequently arose, especially in drug cases. In particular, as counsel for a defendant in a previous case, he had researched the law on search and seizure as it related to abandoned property. In that case police officers had seen a man "slipping something behind his back". Counsel had filed a motion to suppress, which was denied.

---

1. After the verdict new counsel were appointed to represent Brown.

Trial counsel was given full discovery of the evidence by the prosecutors assigned to the case. In addition he conferred with Brown on several occasions concerning the case and the proper strategy for defense. Two days before trial, in a "very short conversation on the order of about thirty seconds, perhaps a minute", Brown asked him to file a motion to suppress. Counsel told Brown he thought the motion would not lie because the bag containing the narcotics had been abandoned. Brown did not protest, and nothing more was said about filing a motion. Counsel and Brown decided to defend on the basis that the government had to prove beyond a reasonable doubt that Brown possessed the narcotics. Trial counsel testified that this defense "was simply determined by the facts of the case as I found them to be during discovery and my conversation with Brown." In support of the defense counsel called a witness who testified before the jury that he had been with Brown when Brown was arrested and for two hours before that time, had seen the bag of narcotics when the policeman pulled it out of the bush, and that he was "positive" that at no time had he seen Brown in possession of the bag.

■ Defense counsel is not required to file a motion to suppress in every case in which evidence obtained by a search is offered against a defendant. On the contrary, counsel must exercise his best professional judgment in deciding whether there are sufficient grounds for filing a motion. Were this not so counsel would be required to file a motion to suppress in every case, to protect himself against a charge of incompetency. *See United States v. Aulet*, 618 F.2d 182, 187–88 (2d Cir. 1980). A defendant is of course entitled to the reasonably competent assistance of counsel acting as a diligent, conscientious advocate. *United States v. DeCoster*, 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973); *United States v. Moore*, 180 U.S.App.D.C. 227, 554 F.2d 1086 (1976). This means counsel's professional judgment must be an informed judgment based on adequate preparation and knowledge of the facts and applicable law. If counsel makes such a judgment and it falls

within the range of competence demanded of attorneys in criminal cases, we may not find him ineffective because the perfect vision of hindsight indicates that his judgment may have been mistaken. *United States v. Smith*, 179 U.S.App.D.C. 162, 168, 551 F.2d 348, 354 (1976); *United States v. Moore, supra; United States v. Blue Thunder*, 604 F.2d 550, 554–55 (8th Cir.), *cert. denied* 444 U.S. 902, 100 S.Ct. 215, 62 L.Ed.2d 139 (1979).

■ In the case before us trial counsel's previous research had made him familiar with the law relating to the abandonment of personal property. He was fully informed of the facts through discovery and interviews with his client. On this basis counsel decided that the court would hold that Brown had abandoned the heroin. Accordingly, counsel concluded that a motion to suppress would be futile. His "failure to move to suppress was thus the product of deliberate and informed decision, not oversight or inadvertence." *United States v. Smith, supra*, 179 U.S.App.D.C. at 167, 551 F.2d at 353 [Footnote omitted]. We think the decision was neither unreasonable nor plain error. Certainly it was not a mistake so serious that it constituted ineffective assistance of counsel. By the same token, it did not constitute "cause shown" to grant relief from the waiver provision of Rule 12(f). Rule 12(f) would have no force if any mistake by counsel which an appellate court considers "serious", although not amounting to ineffective assistance, would excuse failure to comply with the rule.

Brown's counsel on appeal contend that trial counsel's decision to forego a motion to suppress was based on inadequate research or misinterpretation of the law. On the contrary we think that counsel's judgment was a reasonable assessment of both the facts and the law. As the panel opinion recognized, abandonment is primarily a matter of intent, and intent may be inferred from the words and actions of the defendant and other objective facts. Police pursuit does not of itself render abandonment involuntary. *United States v. Col-*

bert, 474 F.2d 174, 176 (5th Cir. 1973). In view of the conduct of Brown on the occasion when he discarded the bag of heroin it is plain to us that trial counsel could reasonably conclude that Brown intended to abandon the bag and that a court would so hold. This view of the evidence was confirmed by the district judge who remarked, during the hearing on the motion for a new trial:

> The Court, of course, heard the trial and recalls that the entire picture was that this man wanted to disassociate himself from the bag completely in hopes the police would not think he had anything to do with it.

(Motion TR. 18–19)

A case similar to this one in many respects is *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365 (1975). In that case the defendant, driving his automobile, stopped in front of a dry cleaning establishment. When he saw a police squad car pull up behind him he ran into the cleaning establishment, followed by the police, and tucked an eyeglass case under the counter. Police retrieved the case, found it contained a hypodermic syringe and other drug paraphernalia, and arrested the defendant. The Supreme Court of Minnesota held that the defendant had abandoned the eyeglass case. After quoting from *United States v. Colbert, supra*, the court said that the defendant

> argues . . . that his intention was merely to hide the case not to relinquish his right of ownership. That is not the test.
>
> The distinction between abandonment in the property-law sense and abandonment in the constitutional sense is critical to a proper analysis of the issue. In the law of property, the question, as defendant correctly states, is whether the owner

has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest. Brown, Personal Property (3 ed.) § 1.6. In the law of search and seizure, however, the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. *Cf. Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein.

237 N.W.2d at 370–371 [Footnote omitted]. The reasoning of the Minnesota court might well be applied to Brown's action in discarding his bag of heroin.[2]

Trial counsel's representation of Brown, including his failure to move to suppress the evidence, did not fall below the level of effective assistance of counsel. Accordingly there was no "cause shown" to grant relief from the waiver provision of Rule 12(f).

The opinion of the panel is vacated, and the judgment of the District Court is affirmed.[3]

*So ordered.*

WILKEY, Circuit Judge, concurring:

I concur in the excellent opinion of Judge Robb for the court. I am writing here solely to point out an alternate ground for decision in this case not otherwise considered today. The court's opinion addresses a relatively narrow issue involving the application of rule 12(f).[1] Generally, courts

---

2. We do not of course hold that as a matter of law the bag of heroin was abandoned; we say only that, in light of the facts and the law, trial counsel's decision was neither unreasonable nor plain error.

3. We reject Brown's additional contention that it was error to admit the prior conviction of a defense witness for impeachment purposes. *See* Fed.R.Evid. 609(a).

1. Rule 12(f) of the Federal Rules of Criminal Procedure provides that failure to make a motion before trial for suppression of evidence under the exclusionary rule "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." Rule 12(f) is the unchanged successor of old rule 12(b)(2). The majority opinion principally directs its attention to determining whether the appellant has satisfied the requirement that cause be shown, *i. e.*, inadequate assistance of counsel.

*should* limit the scope of their decisions to the narrowest holding that will dispose of the case before them. That proposition, closely associated with the justiciability doctrines of mootness, ripeness, and standing, follows from a correct understanding of the limited lawmaking role of the courts.[2] Sometimes, however, with too narrow a focus a court may lose sight of the forest in the face of all the trees. So it is in this case. There is another ground of decision, so patently applicable and so clearly dispositive, that we should have relied on it here. Had we done so, our result today would have been clearer, neater, and more helpful to future courts and litigants.

At issue in this case is whether the exclusionary remedy can be invoked *after trial* by a defendant whose lawyer failed to file a pretrial suppression motion at the appropriate time before trial. The appellant here contends that he has a right to a post-trial consideration of his exclusionary rule claim because his attorney's failure to raise that claim in a timely fashion constituted a serious, prejudicial error amounting to a serious defect in the assistance rendered to him by his counsel.

The exclusionary remedy, however, is not a personal right to which a defendant is entitled. That idea has been clearly rejected by the Supreme Court. The appellant in this case has no entitlement whatever to the benefits of the exclusionary remedy. The exclusionary remedy exists solely for the purpose of removing what incentive

there might otherwise be to unconstitutional police conduct.[3]

Had his attorney moved at the appropriate time for suppression of the evidence at issue, the appellant would have been serving merely as an instrument of the public's interest in the suppression of unconstitutionally obtained evidence. When an attempt is made after trial to suppress evidence under the exclusionary rules, the only appropriate inquiry is whether the public interest in deterring the unconstitutional seizure of evidence outweighs the public interest in the orderly conduct of trials and in the finality of criminal convictions.[4] The interest of the individual defendant concerned is immaterial, except insofar as it provides an incentive for him to bring before the court arguments based on the public interest.

The true question in this case, then, is whether posttrial imposition of the exclusionary remedy for whatever reason would provide an incremental disincentive to unconstitutional police action outweighing the costs. I conclude it plainly does not. I would therefore affirm for that reason without the need for inquiry into the performance of the appellant's counsel.

## I. THE AIMS OF THE EXCLUSIONARY REMEDY

The exclusionary remedy has not always been a fixture in Fourth Amendment law. Although the Supreme Court's opinion in *Boyd v. United States*[5] in 1886 foreshad-

I totally agree that he did not. Like the opinion for the court, my concurrence does not address the issues that would arise in a case involving an appellant who was not aware and did not have the means reasonably to become aware until the time for pretrial motions had passed that evidence against him was vulnerable to Fourth Amendment challenge. The case before us does not involve a lack of opportunity for the defense to present its Fourth Amendment claim, but rather a defense attorney who—for whatever reason—failed to make at the appropriate time a suppression motion that could have been made based on the information available then.

**2.** For a recent, cogent summary of the principles determining the lawmaking role of the federal courts, see Brilmayer, *The Jurispru-*

*dence of Article III: Perspectives on the "Case or Controversy" Requirement*, 93 Harv.L.Rev. 297 (1979).

**3.** *See* p. 235 *infra.*

**4.** *See* p. 236 *infra.*

**5.** 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *Boyd* held that the compelled production of a person's books and papers for use against him at trial violates both the Fourth and Fifth Amendments. The scope of *Boyd* was greatly curtailed in *Adams v. New York*, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904), in which the Court noted that *Boyd* had relied heavily on the privilege against self-incrimination, *id.* at 598, 24 S.Ct. at 375, and, in a case based solely on

owed the development of the rule, the actual history of the exclusionary remedy did not begin until the Supreme Court's decision in *Weeks v. United States*[6] in 1914, a century and a quarter after the ratification of the Bill of Rights. It took another forty-seven years before the doctrine was applied to the states by the Court's decision in *Mapp v. Ohio*,[7] announced just twenty years ago in 1961.

The costs of the rule have always been well understood, and they have become even more apparent since the rule has been applied against the states to all criminal cases rather than limited to the much shorter list of federal crimes. The uncommonly high costs this rule has imposed on the judicial process at criminal trials has frequently been noted by the Supreme Court. Justice Jackson put it this way:

> Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating

evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches.[8]

These extraordinary costs perhaps were more easily borne when the operation of the exclusionary remedy was limited to white collar federal crimes such as income tax evasion and counterfeiting. And the willingness to bear these costs was perhaps greater in an era more sensitive than ours to the dangers of a powerful, centralized federal government. But once the rule was applied to the states and the less antiseptic state crimes—murder, rape, robbery, arson—the high costs the rule exacts became less tolerable.[9] So when applications of the rule were litigated before them, courts began to look longer and harder before imposing the rule to ensure that its purposes would in fact be served in the cases before them. As courts saw criminals guilty of the most wicked crimes go free as the incidental beneficiaries of the rule's operation, they began to refuse to invoke the rule in situations in which its asserted purposes could only marginally be fulfilled.[10] A

the Fourth Amendment, adhered to the common-law view that the provenance of competent evidence does not concern a trial court.

6. 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *Weeks* held that a defendant aggrieved by an illegal seizure of his property by federal authorities could petition before trial for its return. In the subsequent case of *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), the Court broadly announced that evidence obtained by unconstitutional means could not be admitted at trial in federal court.

7. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

8. *Irvine v. California*, 347 U.S. 128, 136, 74 S.Ct. 381, 384, 98 L.Ed. 561 (1954) (plurality opinion).

9. *Stone v. Powell*, 428 U.S. 465, 489–90, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976). For a discussion of the historical significance of the extension of the exclusionary rule to state trials, see *California v. Minjares*, 443 U.S. 916, 100 S.Ct. 9, 61 L.Ed.2d 892 (1979) (Rehnquist, J., dissenting from denial of stay).

10. Thus the Court stiffened the limitations on who has standing to object to the introduction

of unconstitutionally seized evidence, *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The Court has also sanctioned the use of unlawfully seized evidence in grand jury proceedings. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). In addition, the Court has refused to exclude evidence unlawfully seized when used to impeach a defendant. *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). The opportunity of state prisoners to attack their convictions collaterally in *habeas corpus* proceedings based on the use of unconstitutionally obtained evidence at trial has been withdrawn. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). And the retroactive application of exclusionary rule decisions has been sharply curtailed. *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The Court only last year ruled that courts may not invoke their supervisory powers to exclude evidence on behalf of a defendant who lacks standing even when the evidence is the fruit of a search which was "flagrantly

leading commentator summed up the mood: "Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest . . . ." [11]

The attempt to cabin the rule's operation to that core of circumstances in which the rule's central functions at least arguably would be vindicated required that the rule's foundations be better elaborated. The rhetoric to be found in various cases invoking the rule over the years was combed, the chaff discarded, and only the kernel retained.

The results of this process were admirably summarized in the opinion for the Court in *Stone v. Powell*.[12] Justice Powell noted that two principal reasons for application of the rule had been advanced, but that only one played more than a "limited role" [13] in determining whether the rule would be applied in particular concrete situations. "The primary justification for the exclusionary rule," wrote Justice Powell, "is the deterrence of police conduct that violates Fourth Amendment rights." [14] The second principal justification for the rule, "the 'imperative of judicial integrity,' suggesting that exclusion of illegally seized evidence

prevents contamination of the judicial process," [15] was found to have "limited force as a justification for the exclusion of highly probative evidence." [16]

In support of this contention Justice Powell noted five circumstances [17] in which the interest in promoting judicial integrity does not prevent the introduction in the courtroom of illegally obtained evidence or persons: (1) courts do not exclude unconstitutionally seized evidence if the defendant consents to its introduction, or even if he simply fails to object; [18] (2) courts do not exclude unlawfully obtained evidence if the defendant objecting to its introduction was not the victim of the constitutional violations of which he complains; [19] (3) court proceedings do not abate when the defendant's presence has been unconstitutionally obtained by unlawful seizure of his person; [20] (4) illegally seized evidence can be used in grand jury investigations; [21] and (5) evidence tainted by the unconstitutional means by which it was obtained can be used at trial to impeach a defendant.[22] To this list we may now add a sixth situation considered in *Stone v. Powell:* (6) a defendant may not use the admission at his trial of unconstitutionally obtained evidence as a basis for collateral attack on his criminal conviction.

illegal" and "possibly criminal." *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

11. Amsterdam, *Search, Seizure, and Section 2255: A Comment*, 112 U.Pa.L.Rev. 378, 389 (1964) (footnotes omitted) (quoted with approval in *Stone v. Powell*, 428 U.S. 465, 487 n.24, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976)).

12. 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

13. *Id.* at 485, 96 S.Ct. at 3048.

14. *Id.* at 486, 96 S.Ct. at 3048.

15. *Id.* at 484, 96 S.Ct. at 3047 (quoting *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)).

16. *Id.* 428 U.S. at 485, 96 S.Ct. at 3048.

17. *Id.*

18. *Cf. Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) (defendant failed to comply with state procedural requirement of contemporaneous objection to the introduction of unlawfully seized evidence).

19. *United States v. Salvucci*, 447 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 216 (1973); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

20. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 112, 96 L.Ed. 541 (1952).

21. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

22. *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

Thus courts have come to view the primary—indeed almost the sole—justification for the exclusionary rule as the deterrence of police conduct in violation of Fourth Amendment rights,[23] and, in view of the huge costs imposed on society whenever the rule is successfully invoked, courts have restricted the application of the rule "to those areas where its remedial objectives are thought most efficaciously served."[24] Each new application of the rule, then, must be grounded in a careful consideration of the balance between the rule's high cost and whatever incremental deterrence its imposition may create. The operation of the rule must be based on "pragmatic analysis of the exclusionary rule's usefulness in a particular context."[25]

In the case before us we thus confront a simple question: would the incremental deterrence to police misconduct created by the provision of a post-trial opportunity to litigate an exclusionary rule question outweigh the costs of invoking the rule?

## II.  THE COSTS OF THE RULE

We begin by examining what is to be found in the pan on the costs side of the balance. Here we find not only the costs associated with all applications of the exclusionary rule but also additional costs arising from the disruption of orderly trial procedure, which any relaxation of the rules regarding what must be done before trial entails.

The general disadvantages of the exclusionary rule are well known. First, "the physical evidence . . . excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant."[26] The truthfinding function of a trial is thus subverted whenever the rule is successfully invoked. Second, "the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding."[27] What should be a trial of the defendant becomes instead an

**23.** *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) ("*Post-Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any '[r]eparation comes too late.' *Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965)"); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) (footnote omitted) ("the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved"); *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) ("The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.").

**24.** *Stone v. Powell*, 428 U.S. 465, 486–87, 96 S.Ct. 3037, 3048–3049, 49 L.Ed.2d 1067 (1976) (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)).

**25.** *Id.* 428 U.S. at 488, 96 S.Ct. at 3049. In *Stone v. Powell* the Court recounted the balancing of the costs and benefits of the exclusionary rule in previous cases, noting, for example, that "our refusal to extend the exclu-

sionary rule to grand jury proceedings was based on a balancing of the potential injury to the historic role and function of the grand jury by such extension against the potential contribution to the effectuation of the Fourth Amendment through deterrence of police misconduct," *id.* at 487, 96 S.Ct. at 3049, and that, with respect to government use of unlawfully seized evidence to impeach the credibility of a defendant, "the public interest in determination of truth at trial was deemed to outweigh the incremental contribution that might have been made to the protection of Fourth Amendment values by application of the rule," *id.* at 488, 96 S.Ct. at 3049 (footnote omitted). The *Stone* Court also found a balancing process at work in the standing decisions: "The standing requirement is premised on the view that the 'additional benefits of extending the . . . rule' to defendants other than the victim of the search or seizure are outweighed by the 'further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.' " *Id.* at 488–89, 96 S.Ct. at 3049–3050 (quoting *Alderman v. United States*, 394 U.S. 165, 174–75, 89 S.Ct. 961, 966–967, 22 L.Ed.2d 176 (1969)).

**26.** *Id.* 428 U.S. at 490, 96 S.Ct. at 3050.

**27.** *Id.* at 489–90, 96 S.Ct. at 3050.

opportunity to discipline the police. Third, the application of the rule results in the exclusion of evidence without any regard for the disparity in the particular case at hand between the error committed by the police and the windfall benefit afforded the defendant, "contrary to the idea of proportionality that is essential to the concept of justice." [28] Fourth, by freeing the guilty for reasons incomprehensible to most of the public, the rule "may well have the ... effect of generating disrespect for the law and administration of justice," [29] thereby counteracting the rule's purpose of engendering respect for Fourth Amendment values. Perhaps most important and most dramatic of all, if the defendant is guilty, the rule may well gratuitously liberate him to resume immediately his criminal endeavors and thereby, in effect, to punish the public for the policeman's error.

In addition to these general costs which must be borne whenever the exclusionary rule is applied, there are other costs peculiar to the situation before us. Permitting post-trial litigation of questions regarding the suppression of evidence necessarily undercuts the purposes of rule 12 in requiring that motions to suppress "be raised prior to trial." [30] This requirement of rule 12 serves several functions. First, it is designed "to eliminate from the trial disputes over police conduct not immediately relevant to the question of guilt." [31] Second, the rule serves to eliminate unnecessary litigation which wastes the time of prosecutors, defense lawyers, judges, and the members of the public who are drafted into serving on the jury. If the evidence vulnerable on constitutional grounds is suppressed at a pretrial hearing, the prosecutor may well seek a plea-bargained conviction on a lesser charge or may even dismiss the case against the defendant. In either case much in the way of judicial resources will be conserved.

On the other hand, if the evidence survives a pretrial suppression hearing, the defendant may well seek a plea-bargained settlement, or may decide to plead guilty in the face of overwhelming—and admissible—evidence against him. Either way, much will be saved by an early determination of the admissibility of evidence which may be challenged on constitutional grounds.

There are yet other purposes served by the requirement of rule 12 that motions to suppress be made before trial. The greater the passage of time before the consideration of any evidentiary question, the greater the risk that witnesses will become unavailable, that memories will fade, and that relevant evidence will be lost or otherwise become unavailable. Rule 12 ensures as fresh a determination as possible of the factual issues that must be resolved before the lawfulness of a search or seizure can be decided. Moreover, if the defendant's objection is meritorious and the court rules that unlawfully seized evidence be excluded, the prosecution may still have time to uncover other probative evidence to replace that suppressed. But when evidence is sought to be suppressed post-trial, not only may the trial have to be repeated, but other available evidence the prosecution could have found may by then have been lost.

We thus see that the costs, both general and particular, of permitting post-trial attempts to suppress evidence on exclusionary rule grounds are high indeed.

## III. THE SPECULATIVE BENEFITS OF POST–TRIAL EXCLUSION

We now turn to see what can be found in the pan on the benefits side of the balance. For only if the benefits outweigh the costs can the exclusionary remedy be afforded to the defendant. At the outset it is impor-

---

**28.** *Id.* at 490, 96 S.Ct. at 3050.

**29.** *Id.* at 491, 96 S.Ct. at 3051.

**30.** Fed.R.Crim.P. 12(b)(3).

**31.** Advisory Committee Note for 1974 Amendments to rule 12 (quoting *Jones v. United States,* 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960), discussing the predecessor provision to rule 12(b)(3), former rule 41(e)).

tant to emphasize what *cannot* be placed on the benefits side. In particular, whatever advantage might accrue to the defendant as a result of the exclusion of evidence at this late stage is simply immaterial. The exclusionary remedy is designed to deter police misconduct. It is most emphatically not a personal right. Any benefit accruing to any defendant as a result of the exclusion of evidence is purely incidental.[32]

The Supreme Court has underscored this point time and again. The Court made this point long ago, even before its decision in *Mapp v. Ohio* applying the exclusionary remedy to the states, when it emphasized that "[t]he rule is calculated to prevent, not to repair."[33] The Court has reiterated the point right up to the present day. For example, in *Stone v. Powell* the Court put it this way: "Post-*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure . . . ."[34] And again in *United States v. Calandra* the Court wrote: "[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."[35]

The appellant thus does not have a personal entitlement to the benefits of the rule. In consequence he cannot complain on his own account that he has been deprived of its benefit. In his arguments before us he serves merely as an instrument of the public interest, motivated undoubtedly by self-interest, but constrained to channel his efforts on his own behalf into the presentation of arguments on behalf of the public. Should he prevail, he will receive payment in the form of the reversal of his conviction. But should he fail, he has lost nothing to which he has a personal claim.

The sole benefit of decisional significance the exclusionary remedy provides is the deterrent effect its present application may have on future police conduct. The appellant's argument must then be that a police officer will be less likely to commit unconstitutional acts if he knows that, should the defendant's lawyer fail to make a timely pretrial suppression motion through plain error, the defendant will have a post-trial opportunity to litigate his Fourth Amendment claims.

I submit this argument is absurd on its face. Apart from the unlikelihood that police officers who are not also criminal lawyers will even be aware of this court's interpretations of rule 12(f), I find it simply incredible that an officer contemplating unconstitutional acts would fold such a consideration into his calculations. To accept this argument we would have to imagine a policeman tempted to make an unconstitutional search or seizure pausing to think and then being dissuaded by the consideration that the prospective defendant, if he is so unlucky as to have a lawyer who commits plain error in failing to file a timely pretrial suppression motion, will have another bite at the apple. The notion is preposterous, and especially so in view of the uncertainty, empirical and theoretical, regarding whether police are in fact deterred by the very existence of the exclusionary remedy,[36] let alone by such marginal refinements.

I conclude that the pan on the benefits side of the balance is empty, or at the very least contains only highly speculative advantages with the weight of a feather.

---

32. *See* p. 235 *supra.*

33. *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

34. 428 U.S. at 486, 96 S.Ct. at 3048.

35. 414 U.S. at 348, 94 S.Ct. at 620 (footnote omitted).

36. *Compare, e. g.*, Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L. Rev. 665 (1970); Spiotto, *Search and Seizure: An Empirical Study of the Exclusionary Rule and Its Alternatives*, 2 J. Legal Stud. 243 (1973) with Canon, *Is the Exclusionary Rule in Failing Health?, Some New Data and a Plea Against a Precipitous Conclusion*, 62 Ky.L.J. 681 (1974).

## IV. CONCLUSION

This is therefore a straightforward case. The balancing process which the Supreme Court has followed in deciding whether or not the exclusionary remedy should be extended to new situations tilts solely to one side. This is simply not an appropriate circumstance for the application of the exclusionary remedy.

The rule provides a windfall benefit to the defendant who successfully invokes it. We have so far accepted this result, despite its adverse effect on the security of the law-abiding public, because the deterrence of future police misconduct we hope to obtain can be purchased only at this price. In effect, by adopting the exclusionary remedy the courts have decided to hire criminals to act as private attorneys general to prosecute the police for constitutional violations. When successful, these private attorneys general are handsomely rewarded with liberty they do not deserve. It is not too much to ask that to earn their reward they file their claims at the appropriate time.